HARMON CABLE COMMUNICATIONS OF NEBRASKA LIMITED PARTNERSHIP, A LIMITED PARTNERSHIP, APPELLEE AND CROSS-APPELLANT, V. SCOPE CABLE TELEVISION, INC., A CORPORATION, APPELLANT AND CROSS-APPELLEE. HARMON CABLE COMMUNICATIONS OF NEBRASKA LIMITED PARTNERSHIP, A LIMITED PARTNERSHIP, APPELLEE AND CROSS-APPELLANT, V. SCOPE CABLE TELEVISION OF NEBRASKA CO., A GENERAL PARTNERSHIP, APPELLANT AND CROSS-APPELLEE.

468 N.W.2d 350

Filed April 19, 1991.    Nos. 88-821, 88-822.

Neil B. Danberg and James L. Schneider, of Kennedy, Holland, DeLacy & Svoboda, for appellants.

M.J. Bruckner and Paul J. Peter, of Bruckner, O'Gara,

Keating, Sievers & Hendry, P.C., for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

## I. INTRODUCTION

Under separate contracts, plaintiff-appellee, Harmon Cable Communications of Nebraska Limited Partnership, a limited partnership, purchased through its predecessor in interest, Harmon & Company, Inc., a cable television system from each of the defendants-appellants, Scope Cable Television, Inc., a corporation, and Scope Cable Television of Nebraska Co., a general partnership. Claiming that each of the sellers failed to deliver the promised number of subscribers and that each had improperly charged for certain accounts receivable, the purchaser brought the action designated in this court as case No. 88-821 against the corporate seller and the action denominated herein as case No. 88-822 against the partnership seller. Each seller in turn counterclaimed to recover on a promissory note the purchaser had executed in favor of the sellers.

In each suit the trial court granted the purchaser a partial summary judgment, ruling that the seller had indeed failed to deliver the promised number of subscribers. Pursuant to the agreement of the parties, the cases were thereafter consolidated for trial. A jury trial followed on the question of the damages resulting from the sellers' failure to deliver the promised number of subscribers. The jury returned verdicts finding that the purchaser had been damaged in each transaction.

By further agreement of the parties, the trial court, as the finder of fact and law, adjudicated the issues presented by the purchaser's accounts receivable claims and the sellers' counterclaims. The trial court awarded the purchaser an adjustment on the accounts receivable in each case and granted each seller a setoff under the note it had obtained from the purchaser.

After appeal to this court the cases were consolidated for briefing and argument. The sellers claim the trial court erred in (1) sustaining the purchaser's motions for partial summary

judgment on the issue of liability, (2) admitting certain of the purchaser's damages evidence and refusing the sellers' damages instructions, (3) refusing to instruct the jury that the purchaser had a duty to mitigate its damages, (4) permitting the purchaser to withdraw a claim of attorney-client privilege with respect to a certain exhibit, in admitting said exhibit into evidence, and in not permitting its author to fully explain it, (5) overruling the sellers' motion for mistrial made at the conclusion of closing arguments, and (6) failing to grant the sellers' posttrial motions and in initiating proceedings subsequent to acceptance of the jury's verdicts and discharge of the jury.

By cross-appeal, the purchaser claims the trial court erred in granting the sellers interest on the promissory notes made by the purchaser.

Although the record sustains none of the sellers' assignments of error, the trial court incorrectly assessed the interest due on the promissory notes. Accordingly, we vacate the judgments of the trial court and remand with the direction that judgments be entered in accordance with this opinion.

## II. FACTS

On June 21, 1985, the purchaser's predecessor in interest and the sellers entered into the contracts described in part I. By their terms, the contracts were not to be closed until sometime between October 31 and December 31, 1985. Although there were two separate sellers, cable systems, and contracts, the purchaser insists that it approached the transactions as one purchase, for one price, agreeing to the separate contracts and price allocations made therein as an accommodation to the sellers.

As part of its contract, the corporate seller warranted that it would, as of the date of closing, deliver at least 1,200 "basic subscribers," that is, consumers of the basic cable services the seller offered, and 1,160 "pay subscribers," that is, consumers of services in addition to basic services. The partnership seller warranted that it would deliver at least 2,125 basic subscribers and 2,060 pay subscribers.

In August or September 1985, the sellers informed the purchaser's predecessor of potential subscriber shortfalls. On

October 18, 1985, the purchaser's predecessor assigned its rights under the agreements to the purchaser.

On November 5, 1985, the parties entered into a written addendum to their agreements. This document acknowledged that the sellers would be unable to deliver the warranted number of subscribers, and recited that the parties disagreed as to the purchaser's remedies for that failure. The compact noted that the sellers were of the view that the purchaser's sole remedy was to terminate the agreements and receive a refund of all moneys paid, whereas the purchaser maintained that such failure was a breach of the agreements, entitling it to exercise any remedy agreed upon in the contracts, including the instigation of a lawsuit. Having thus covenanted to disagree, the parties nonetheless contracted to close and complete the transactions on November 5, 6, or 7, 1985.

At the November 5, 1985, closing, the purchaser delivered $2,470,000 to the sellers, plus a note in the sum of $5,000 to the corporate seller and a note in the sum of $20,000 to the partnership seller, totaling the agreed-upon purchase price of $2,495,000.

On December 3, 1985, the purchaser sent the sellers a letter notifying them that they had not delivered the warranted number of subscribers, that they had sold accounts receivable which represented past-due balances on disconnected accounts in violation of the purchase agreements, and that unless they cured these failures within 60 days, the purchaser would offset against its damages those amounts otherwise due the sellers under the promissory notes the purchaser had issued. These lawsuits followed.

The number of subscribers actually delivered was undisputed at trial. The corporate seller delivered 1,144 basic and 813 pay subscribers, amounting to a shortfall of 56 basic and 347 pay subscribers. The partnership seller delivered 2,096 basic and 2,085 pay subscribers, amounting to a shortfall of 29 basic subscribers and a surplus of 25 pay subscribers. Each of the contracts provides that one basic subscriber is the equivalent of two pay subscribers. The parties therefore agreed that the corporate seller failed to deliver 229.5 "equivalent basic units," the 56 basic subscriber shortfall plus one-half of the 347 pay

subscriber shortfall. (We hereafter refer to the equivalent basic units simply as "units.") Likewise, the parties agreed that the partnership seller failed to deliver 16.5 units, the 29 basic subscriber shortfall less one-half of the 25 excess pay subscribers delivered. Therefore, there was an agreed total subscriber shortfall of 246 units, the 229.5 corporate shortfall plus the 16.5 partnership shortfall.

In testifying about the purchaser's damages, Alan Harmon, chairman of the board of the purchaser's predecessor, employed a "cash-flow multiplier" method in calculating the purchaser's damages. He explained that at the time of the transactions, it was the cable industry standard to sell cable systems for seven to eight times annual cash-flow. Harmon testified that in framing the offer of $2,495,000 for the purchase of the two systems, his company considered estimates of the sellers' cash-flows multiplied by 7.76. To measure the purchaser's damages, Harmon first determined the lost annual cash-flow resulting from the subscriber shortfall. For purposes of this calculation, Harmon stated that basic subscribers generate, after expenses, $123.58 annual cash-flow, whereas pay subscribers generate only $38.73 net annual cash-flow. Harmon multiplied these values by the appropriate subscriber shortfall and then multiplied that product by the cash-flow multiplier, which resulted in total damages of $177,385, $157,020 being apportioned to the corporate seller and $20,365 to the partnership seller.

The purchaser also called Marc Weisberg, a cable television system broker engaged in the selling and financing of cable systems. He testified that while the cash-flow multiplier method Harmon utilized was an objective, direct way of calculating the worth of a cable system and a legitimate method to use in determining damages in cases of subscriber shortfalls, he considered another method to be equally valid and employed that other method. Weisberg noted that between the two contracts, the sellers warranted the delivery of 4,935 units, the 3,325 basic subscribers warranted plus one-half of 3,220 pay subscribers warranted. He then divided the 4,935 units into the purchase price and attained a purchase price of $506 per unit. In his view, the purchaser's damages were the product of

multiplying that unit purchase price by the 246-unit shortfall, a total of $124,476.

The sellers countered with the testimony of Robert Jones, a professional consultant and appraiser in the telecommunications industry. Jones offered two methods for calculating damages. Under the first method, he focused on the paragraph in each of the contracts which purports to allocate the purchase price to various items. Each paragraph declares:

> Seller and [Purchaser] agree that this Agreement for the sale of the Business, including the trade fixtures, furniture, equipment and inventory and other assets, tangible or intangible (including the Covenant Not to Compete) *is indivisible* even though separate considerations are to be stated for such property. Seller and [Purchaser] further agree that the purchase price shall be allocated in the following manner . . . .

(Emphasis supplied.)

The corporate allocation is as follows:

| | |
|---|---:|
| Covenant Not to Compete | $1,000 |
| Franchise | 280,000 |
| CATV System | 255,000 |
| Land | 20,000 |
| Buildings | 70,000 |
| Vehicles, heavy equipment | 5,000 |
| Tools and test equipment | 6,000 |
| | $637,000 |

The partnership allocation is as follows:

| | |
|---|---:|
| Covenant Not to Compete | $2,000 |
| Franchise | 198,000 |
| CATV System | 1,607,000 |
| Easement Rights | 2,000 |
| Buildings | 22,000 |
| Vehicles, heavy equipment | 10,000 |
| Tools and test equipment | 17,000 |
| | $1,858,000 |

Jones testified that the value of the subscriber list was only a portion of the item termed "Franchise." He stated that taking into account the services made available by the systems, the value of the entire subscriber lists of the two sellers was

$191,500. Jones then divided that figure by the 4,935 warranted units and obtained a value of $39 per unit. Multiplying this value by the 246-unit shortfall, Jones concluded that the purchaser's total damages were $9,594.

Jones also posited a replacement cost method for determining the purchaser's damages. He stated that under prevailing industry standards, including consideration of marketing fees and installation expenses, the purchaser could replace each missing unit for $38.44. Under this approach, Jones stated that the purchaser's damages were $9,456, $38.44 multiplied by 246 units.

The sellers also offered the testimony of Michael Kruger, the former president of the purchaser and its predecessor. Kruger, who left the purchaser in 1986, refuted Harmon's testimony concerning the process by which the predecessor had valued the sellers' systems both during the negotiations and in calculating the damages resulting from the subscriber shortfalls. Kruger testified that the value of the subscriber list comprised a portion of the value attributable to the franchise portion of the allocation paragraphs and that the purchaser's damages were "minimal," in the "$20,000 range."

The purchaser recalled Harmon on rebuttal and through him offered, solely for the purpose of rebutting Kruger's trial testimony, a letter Kruger had written while president of the purchaser to one of the purchaser's non-Nebraska attorneys. Kruger therein outlined the four damage assessment methods which were eventually testified about at trial. He also wrote he foresaw the sellers arguing that the purchaser had not been damaged at all, due to an increase in the market value of the systems between the date of signing the contracts and the date of closing.

The sellers objected to the introduction of the letter, claiming that as it had not been produced during discovery, the purchaser could not introduce the letter as evidence at trial. This objection was overruled, and the evidence was received for the limited purpose offered.

On surrebuttal, the sellers recalled Kruger to explain the letter, but the trial court ruled that as the letter was offered for impeachment purposes only, Kruger could not address it for the

purpose of rehabilitating himself. Nonetheless, in response to questions posed by the sellers' trial attorney in a manner construed to impeach Harmon's testimony, Kruger did explain portions of the letter, as detailed in part III(4), *infra*.

The subscriber shortfall issues were submitted to the jury on special verdict forms, which in each case provided a space in which to insert the amount of damages should the jury find for the purchaser. On June 10, 1988, the jury found for the purchaser against the corporate seller in the amount of $9,000 and for the purchaser against the partnership seller in the amount of $110,800. The parties having waived their appearance, the trial court accepted the jury's verdicts and excused the jurors.

On June 20, 1988, each of the sellers filed a combined motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The motions noted that the larger amount of damages was assessed against the partnership seller, which delivered all but approximately one-half of 1 percent of the warranted units, whereas the corporate seller failed to deliver 13 percent of the warranted units. On June 23, 1988, the purchaser filed a motion to correct the verdict forms. Attached to this motion was the affidavit of the jury foreman, which declared that he had made a transpositional error in filling out the special verdict forms.

A hearing was held on the various posttrial motions on July 27, 1988. Citing the juror affidavit, which was received in evidence, the trial court ordered that the jury reassemble to reexamine the verdicts. The jury was reassembled on August 31, 1988, and instructed to consider the possibility of a transpositional error without reconsidering the substantive issues in the cases. Thereupon, the jury returned special verdicts in each case, signed by all the jurors, which recited: "We, the Jury duly impanelled and sworn in the above entitled cause do find that: A transpositional error was made on the verdict forms and we request that they be corrected by the Court to conform to the affidavit of [the jury foreman]."

On September 8, 1988, the trial court entered its judgments. It awarded the purchaser $106,763 against the corporate seller, $110,800 as determined by the jury for the subscriber shortfall

plus $963 in accounts receivable adjustments, less $5,000 due the corporate seller under the promissory note the purchaser had executed.

The trial court also awarded the partnership seller $9,146 against the purchaser. It gave the purchaser credit for $9,000 as determined by the jury on the subscriber shortfall, awarded the purchaser $1,854 in accounts receivable adjustments, and found that the partnership seller was entitled to $20,000 on the promissory note the purchaser executed.

The sellers again filed in each case a motion for judgment notwithstanding the verdict or for a new trial, which motions were overruled on the same day the trial court modified its judgments "to reflect that interest rates on the two Promissory Notes in issue will run from the date of making said Notes."

### III. ANALYSIS OF SELLERS' APPEAL

With that history of the facts in mind, we first turn our attention to the sellers' assignments of error.

#### 1. SUMMARY JUDGMENT

The first assignment questions the propriety of granting the purchaser summary judgment on the question of the sellers' liability for the subscriber shortfall. The sellers claim that the purchaser forfeited any right to damages for that failure because it did not comply with the notice provisions of the contracts and, in any event, did not act in good faith.

#### (a) Notice

Each contract contains an indemnification paragraph, which provides:

> [Purchaser] shall not assume any debts or other liabilities of Seller. *Seller* hereby covenants and *shall* defend and *indemnify [Purchaser]* and hold harmless [Purchaser] at all times after the Closing Date from and against and *in respect to any and all losses, liabilities, costs (including, without limitation, court costs), damages, expenses (including, without limitation, reasonable attorneys fees) or deficiencies arising out of or due to*:
>
> (a) *Any inaccuracy in or breach of any representation, breach of warranty or nonfulfillment of any agreement,*

*covenant or obligation on the part of Seller made in this Agreement*;

   (b) Any and all liabilities or obligations of Seller of any nature, whether accured [sic], absolute, contingent or otherwise, existing on the Closing Date; and

   (c) Any actions, suits, proceedings, costs, expenses and legal fees incident to any of the foregoing items listed under paragraphs (a) and (b) of this paragraph.

*[Purchaser] shall assert any claim* or claims for indemnification under the provisions of this paragraph above *by giving written notice* of such claim or claims to Seller within 30 days of discovery, but not later than 18 months from the date of closing. *Each such notice shall set forth* in reasonable detail the factual basis giving rise to the claim or claims and *the amount of the damages and expenses incurred by [Purchaser] as a result of such claim or claims*. Seller agrees that it shall promptly reimburse and pay [Purchaser] for such damages and expenses. If any claim for indemnification is *based upon an action or claim filed or made against [Purchaser] by a third party*, then Seller shall have the right to negotiate a settlement or compromise of any such action or claim or to defend any such action or claim at the sole cost and expense of, and with counsel selected by Seller.

(Emphasis supplied.)

Whether the sellers' contention that the purchaser cannot recover damages resulting from the subscriber shortfall because it failed to comply with the notification provisions of the indemnification paragraphs has merit depends upon whether those provisions are conditional or promissory. Courts have struggled for centuries with differentiating between conditions and promises. See, e.g., *Constable v. Cloberie*, Palmer 397 (1626), reprinted in 79 Eng. Rep. 1259. While we appear to not have made a detailed analysis of this distinction, we have recognized its existence. See *General Credit Corp. v. Imperial Cas. & Indemnity Co.*, 167 Neb. 833, 95 N.W.2d 145 (1959).

A condition has been defined as "an operative fact, one on which the existence of some particular legal relation depends."

3A A. Corbin, Corbin on Contracts § 627 at 11 (1960). Another author similarly defines a condition as "(1) Any operative fact that will create some new legal relation, or extinguish an existing relation; or, (2) Words or other manifestations that indicate that a fact shall have such operation." 5 S. Williston, A Treatise on the Law of Contracts § 663 at 123-24 (3d ed. 1961). The Restatement definition of a condition is also in accord: "A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 at 160 (1981). See, also, *Cosgrove v. Mademoiselle Fashions*, 206 Neb. 275, 292 N.W.2d 780 (1980) (quoting § 224, formerly § 250).

A promise, on the other hand, occurs when one "expresses an intention that some future performance will be rendered and gives assurance of its rendition to the promisee." 3A A. Corbin, *supra*, § 633 at 25. Again, the Restatement is in accord: "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts § 2(1) at 8 (1981). See, also, *Helle v. Landmark, Inc.*, 15 Ohio App. 3d 1, 472 N.E.2d 765 (1984) (quoting § 2(1)). In the event of nonfulfillment, the distinction between a promise and a condition becomes important. As a general rule, a condition must be exactly fulfilled before liability can arise on the contract. 5 S. Williston, *supra*, § 675; 3A A. Corbin, *supra*, § 633. See, also, *Regent Intern. Hotels v. Las Colinas Hotels*, 704 S.W.2d 101 (Tex. App. 1985); *Knox v. Knox*, 337 Mich. 109, 59 N.W.2d 108 (1953); *Aetna Ins. Co. of Hartford, Conn. v. Jeremiah*, 187 F.2d 95 (10th Cir. 1951); *Friedman v. Decatur Corporation*, 135 F.2d 812 (D.C. Cir. 1943). This general rule finds support in the Restatement as well:

(1) Performance of a duty subject to a condition *cannot become due unless the condition occurs* or its non-occurrence is excused.

(2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.

(3) Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur. (Emphasis supplied.) Restatement (Second) of Contracts § 225 at 165 (1981). See, also, *Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 696 F.2d 359 (5th Cir. 1983) (citing § 225).

Nonfulfillment of a promise, however, gives rise to a different remedy. "The non-fulfillment of a promise is called a breach of contract, and *creates in the other party a secondary right to damages*; it is the failure to perform that which was required by a legal duty." (Emphasis supplied.) 3A A. Corbin, *supra*, § 633 at 26. See, also, J. Calamari & J. Perillo, The Law of Contracts § 11-9 (3d ed. 1987); *Cramer v Metropolitan Savings*, 401 Mich. 252, 258 N.W.2d 20 (1977), *cert. denied* 436 U.S. 958, 98 S. Ct. 3072, 57 L. Ed. 2d 1123 (1978).

Thus, if the notice requirements of the indemnification paragraphs are deemed to be a condition to the sellers' liability, the purchaser's noncompliance would discharge the sellers' liability. If the notice requirements are deemed to be a promise, then the remedy lies in an action for damages.

Whether contractual language is deemed conditional or promissory generally depends upon the intention of the parties. See, e.g., *Mrozik Const. v. Lovering Associates*, 461 N.W.2d 49 (Minn. App. 1990); *Criswell v. European Crossroads S. Ctr.*, 792 S.W.2d 945 (Tex. 1990); *Gildea v. Kapenis*, 402 N.W.2d 457 (Iowa App. 1987); *Cobbs v. Fred Burgos Const. Co.*, 477 So. 2d 335 (Ala. 1985); *Ide v. Joe Miller & Co.*, 703 P.2d 590 (Colo. App. 1984); *Ballenger Corp. v. City of Columbia, S.C.*, 286 S.C. 1, 331 S.E.2d 365 (1985); *Cramer v Metropolitan Savings, supra*. Where the intent of the parties is not clear, the disputed language is generally deemed to be promissory rather than conditional. See, e.g., *Mrozik Const., supra*; *Sahadi v. Continental Ill. Nat. Bank & Trust Co.*, 706 F.2d 193 (7th Cir. 1983); *Mularz v. Greater Park City Co.*, 623 F.2d 139 (10th Cir. 1980); *Howard v. Federal Crop Ins. Corp.*, 540 F.2d 695 (4th Cir. 1976). Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," "on condition that," or some similar phrase are evidence that performance of a contractual provision is a condition. *Criswell, supra*; *Ballenger Corp., supra*.

Notwithstanding application of the rule that in reviewing a summary judgment we view the evidence most favorably to the party against whom the motion is granted and give that party the benefit of all the inferences deducible from the evidence, *Joseph Heiting & Sons v. Jacks Bean Co.*, 236 Neb. 765, 463 N.W.2d 817 (1990), under the state of this record, the absence of any language indicative of a condition precludes a conclusion that the parties clearly intended the notice requirements to constitute a condition to the creation of the contract. They therefore are promises, the breach of which gives rise to an action for damages.

### (b) Good Faith

Citing to Neb. U.C.C. § 1-203 (Reissue 1980), the sellers also contend that the purchaser's failure to conduct a marketing campaign prior to closing the sale amounted to a breach of the requirement of good faith and reasonableness in commercial transactions and that summary judgment thus could not properly lie. In making that claim, the sellers state that this court "has recognized that a similar requirement of good faith and reasonableness is imposed upon parties to agreements that may not necessarily be covered by the [Uniform Commercial Code]." Brief for appellants at 37. In support of that proposition, the sellers cite *Newman v. Hinky Dinky*, 229 Neb. 382, 427 N.W.2d 50 (1988) (requirement of good faith and reasonableness applies to situation where lessor withheld consent to proposed assignment of lease), and *Bernstein v. Seglin*, 184 Neb. 673, 171 N.W.2d 247 (1969) (lessor could not unreasonably refuse to accept a new tenant in mitigation of damages under a lease). Accepting a substitute lessee is quite a different matter from the sale and purchase of a business by knowledgeable and experienced persons. However, assuming for the purposes of this analysis, but not deciding, that a requirement of good faith and reasonableness applies to these transactions, there is still no question of material fact on the issue of the sellers' liability for the subscriber shortfall.

Each of the contracts contains a programming paragraph, which provides:

[Purchaser] and Seller agree to negotiate in good faith a

separate agreement ("Marketing Agreement") under which [Purchaser] may implement changes in any programming as well as rate changes for the premium services, between August 15 and closing, and conduct a marketing campaign. All such activities and related conditions will be set forth in a written "Marketing Agreement", approved by both parties. *If a "Marketing Agreement" is not executed, [Purchaser] shall have no right or obligation to undertake such activities.* No provision of this Agreement, or the performance of the parties hereunder, shall be altered in any way by the "Marketing Agreement", or the performance of the parties thereunder the principal provisions of the "Marketing Agreement" shall include, with limitation:

a) [Purchaser] to coordinate all activities.

b) Seller shall approve [Purchaser's] marketing and capital budgets.

c) [Purchaser] to pay all associated marketing costs. If there is no closing under the purchase agreement, Seller will promptly reimburse [Purchaser] for the actual cost of the marketing.

d) [Purchaser] will advance the costs of any hardware installed in Seller's system; if there is no closing under the Purchase Agreement, Seller will promptly reimburse [Purchaser] for the actual cost of such equipment.

e) All changes in rates and programs to be set forth in the "Marketing Agreement".

(Emphasis supplied.) The foregoing language clearly contemplates that a marketing agreement might not come into existence and provides that in such an event the purchaser would not only have no obligation to undertake a marketing campaign, but it would have no right to engage in such an activity.

The sellers nonetheless assert that via the programming provisions, the purchaser "reserved the right to undertake a marketing campaign." Brief for appellants at 38. At the summary judgment hearing, the sellers introduced the affidavit of Timothy Garrigan, the corporate seller's vice president. Garrigan declared therein that the purchaser had, prior to

September 1985, been informed there would be a shortfall in delivered subscribers and had, pursuant to the aforementioned programming provisions, agreed to undertake a marketing campaign, but elected not to do so. It is the sellers' position that this "reserved right," coupled with Garrigan's affidavit, presents a question of fact "with respect to whether the parties' course of dealing supplemented or qualified the terms of the agreement by their anticipated marketing program." *Id*. at 39.

This asserted oral amendment to the purchase agreements must be considered in light of the subsequent written addendum first discussed in part II. The last paragraph of that addendum recites that "[t]here are no modifications, amendments or changes to the Agreements." Obviously, this written provision stands in stark contrast to the sellers' position that an amendment to the purchase agreements concerning the purchaser's intention to undertake a marketing campaign had been agreed to.

Garrigan's affidavit is tantamount to oral testimony contradicting the terms of the written addendum which unequivocally declare that the original purchase agreements had not been amended or modified. As such, the affidavit is subject to the strictures of the parol evidence rule, which renders ineffective proof of a prior or contemporaneous oral agreement which alters, varies, or contradicts the terms of a written agreement. *Five Points Bank v. White*, 231 Neb. 568, 437 N.W.2d 460 (1989).

Summary judgment is appropriate when the pleadings, depositions, admissions, stipulations, and affidavits in the record show that no genuine issue exists as to any material fact or as to the ultimate inferences that may be drawn from any material fact and that, as a matter of law, the moving party is entitled to judgment. *Lichty v. Federal Land Bank of Omaha*, *ante* p. 682, 467 N.W.2d 657 (1991). As to the issue of the sellers' liability for the subscriber shortfall, the trial court properly concluded that there exists no genuine issue as to any material fact nor the ultimate inferences which may be drawn therefrom and that the purchaser is entitled to judgment as a matter of law. See Neb. Rev. Stat. § 25-1332 (Reissue 1989) (interlocutory summary judgment permitted on issue of

liability notwithstanding existence of genuine issue as to amount of damages).

## 2. DAMAGES

In the next assignment of error the sellers challenge the trial court's handling of the purchaser's shortfall damages evidence and its instructions relating to that topic.

### (a) Evidence

The sellers' first concern in connection with the handling of the damages issue rests on the fact that Harmon was not designated as an expert witness prior to trial. Under a pretrial ruling, one not designated as such prior to trial could not be presented to the jury as an expert. Thus, the question becomes whether he was qualified as a lay witness to testify as he did.

Neb. Rev. Stat. § 27-701 (Reissue 1989) provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

We have ruled that a trial court is given discretion in determining whether a sufficient basis for a lay witness' opinion has been established and that such determination will not ordinarily be disturbed on appeal absent an abuse of that discretion. *Schmidt v. J. C. Robinson Seed Co.*, 220 Neb. 344, 370 N.W.2d 103 (1985).

Harmon began managing and brokering cable systems in 1960. During the next 12 years, he was involved in the purchase of over 100 cable television systems throughout the country. Since 1972, Harmon has operated as an independent broker and consultant in the cable industry, focusing on the acquisition of franchises. At the time of the trial, he was operating cable systems in Nebraska and five other states.

Harmon's testimony was replete with references to industry standards, his own personal experiences in the cable television industry, and his own part in the formulation of these contracts. As such, it cannot be said that his testimony was inadmissible because it was not rationally related to his

perceptions. Similarly, it cannot be said that his opinion as to the damages suffered was not helpful to an understanding of the purchaser's damages claims. Finally, it cannot be said that his opinion was not helpful to a determination of the amount of damages actually suffered by the purchaser. Thus, Harmon's opinion testimony fell within the strictures of § 27-701. The fact that Harmon was a person having an interest in the outcome of the cases goes only to the weight of his testimony, not to its admissibility.

### (b) Instructions

Relying on *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 363 N.W.2d 148 (1985), the sellers further claim that the trial court erred in failing to instruct the jury that any damages award granted the purchaser was limited to the amounts foreseeable by each of the sellers. More specifically, they urge that the dollar amounts claimed by the purchaser are so great as to be unforeseeable and thus unrecoverable: "[The sellers] had no reason to know that [the purchaser] believed a 5% subscriber shortfall was worth $177,000 nor that . . . Weisberg believed the entire transaction was only a 'subscriber' transaction [resulting in a damages estimate of $124,476]." Brief for appellants at 25. However, an examination of the doctrine of foreseeability of damages in general, and of *Birkel* specifically, demonstrates that the sellers' premise is fallacious.

The rule limiting recovery in breach of contract cases to reasonably foreseeable damages arose in the landmark case of *Hadley v. Baxendale*, 9 Ex. 341 (1854), reprinted in 156 Eng. Rep. 145. In *Hadley*, damages for lost profits, suffered while a mill was inoperable due to a broken iron shaft, could not be recovered from a common carrier that unreasonably delayed shipment of a new shaft to the mill where the common carrier had no reason to know that such damages would flow from its breach. The deciding factor in *Hadley* was not that a certain damages amount was foreseeable. Instead, the case turned on the fact that the common carrier, given its limited knowledge of the circumstances, could not foresee that its breach would result in lost profits.

In *Birkel, supra*, this court held that where a grain storage

and drying bin failed due to improper installation, evidence of costs incurred in obtaining alternative drying and storage facilities was foreseeable and should therefore have been admitted at the trial court. In so ruling, the *Birkel* court relied in part on Restatement (Second) of Contracts § 351 at 135 (1981), which reads as follows:

(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

(a) in the ordinary course of events, or

(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation.

Thus, what the sellers foresaw as to the amount of damages their breach would cause is irrelevant. What is relevant is whether the sellers had reason to foresee that the purchaser would suffer damages due to the sellers' failure to deliver the warranted number of subscribers.

The specific contemplation in the negotiated addendum to the agreements, that the purchaser would seek damages for the breach, demonstrates that such damages were not unforeseeable to the sellers. Nor can it be said that the purchaser's damages did not flow from the breach in the ordinary course of events. Thus, the doctrine of unforeseeability of damages is not applicable in these cases.

### 3. MITIGATION

In the third assignment of error, the sellers contend the trial court erred in refusing to instruct the jury that the purchaser had a duty to mitigate its damages.

The sellers correctly note that in Nebraska there exists a general duty to mitigate damages and that a party failing to

mitigate damages is generally precluded from recovering those damages which could have been avoided had that party fulfilled its duty to mitigate. *S.N. Mart, Ltd. v. Maurices Inc.*, 234 Neb. 343, 451 N.W.2d 259 (1990) (landlord has duty to relet premises to mitigate damages where tenant abandons premises); *Gottsch Feeding Corp. v. Red Cloud Cattle Co.*, 229 Neb. 746, 429 N.W.2d 328 (1988) (cattle owner's dealings with agister prior to breach deemed sufficient to avoid application of mitigation doctrine). However, that principle alone is not sufficient to decide the issue in this case.

Under the programming paragraphs of the agreements discussed in part III(1)(b) above, the purchaser had no right to undertake a marketing campaign to add customers prior to the close of the purchase agreements. Thus, the purchaser could have done nothing to mitigate its damages prior to closing.

Moreover, this is not a case wherein a nonbreaching party sat idly by while damages escalated. The purchaser had fully performed its obligations under the purchase agreements. The sellers' failure to deliver the warranted number of subscribers resulted in the purchaser's receiving entities that were not worth as much as those for which it had bargained. Thus, the purchaser's damages, having arisen at the time of the breach, were static.

As stated by the New Mexico Supreme Court, "mitigation of damages does not apply when compensating a wronged purchaser for the loss of the bargain." *Hickey v. Griggs*, 106 N.M. 27, 30, 738 P.2d 899, 902 (1987) (mitigation inapplicable where vendor of real estate breaches executory contract). "The law related to the duty of an injured party to mitigate the damages presumes that further damage has occurred following the tort or breach of contract." *Schroeder v. DiPascal Cabinet Co., Inc.*, 467 So. 2d 1380, 1382 (La. App. 1985) (mitigation not applicable where no further damage occurred following cabinet refinisher's breach in rendition of services to plaintiff).

Although not involving a contract for the purchase and sale of real estate only or for the rendition of personal services, as the aforementioned authorities do, the facts of these cases render them subject to the same principle. The purchaser merely seeks compensation for what it was denied by the sellers'

breach of the bargain the parties had made.

## 4. ATTORNEY-CLIENT PRIVILEGE

Next, the sellers assert the trial court erred in permitting the purchaser to withdraw a claim of attorney-client privilege regarding the Kruger letter described in part II and that it therefore improperly received that document in evidence. In addition, the sellers urge that the trial court erred in not permitting Kruger to explain the writing.

### (a) Receipt of Evidence

The claim that the letter was improperly received in evidence is premised on the assertion that the purchaser withheld its production despite "extensive discovery requests." Brief for appellants at 33. The sellers further state that the purchaser "acknowledged that [the letter] was withheld from discovery as subject to an attorney-client privilege." *Id.* It is the sellers' contention that a document withheld from pretrial discovery under a claim of attorney-client privilege cannot be used at trial by the party asserting that privilege.

However, the claims of the sellers regarding their pretrial discovery requests and the purchaser's responses are not supported by the record. While the purchaser's counsel stated he felt the letter was subject to the attorney-client privilege, there is no showing of a refusal to comply with a discovery request for any reason. Indeed, in an exchange between counsel, the purchaser claimed that it had informed the sellers prior to trial of the existence of the letter. The record is simply devoid of evidence of the sellers' discovery requests. The only indication that the sellers conducted any discovery in this regard lies in its assertion at trial that "we have discovery questions out that are extremely sensitive."

In the absence of a record documenting exactly what discovery the sellers undertook with respect to the letter and exactly how the purchaser responded, the inquiry into that aspect of the matter ends. See, *State v. Biernacki, ante* p. 215, 465 N.W.2d 732 (1991) (appellant responsible for including within bill of exceptions matters material to issues presented for review); *GFH Financial Serv. Corp. v. Kirk*, 231 Neb. 557, 437 N.W.2d 453 (1989).

### (b) Explanation

The remaining portion of this assignment of error, that the trial court erred in refusing to allow Kruger, as the author, to explain the letter's contents, requires a more detailed analysis. As reflected in part II above, the letter was accepted into evidence for the sole purpose of impeaching Kruger's earlier criticism of the methods Harmon used in calculating the purchaser's damages and Kruger's assessment of the purchaser's damages as minimal.

Neb. Rev. Stat. § 27-613 (Reissue 1989) reads, in pertinent part: "(2) Extrinsic evidence of a prior inconsistent statement by a witness *is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon,* or the interests of justice otherwise require." (Emphasis supplied.)

Upon recalling Kruger during surrebuttal, the trial court initially disallowed questioning by the sellers, which would have given Kruger an opportunity to explain the apparent inconsistencies between his trial testimony and the statements contained in his letter.

[Sellers' counsel]. Mr. Kruger, I'm going to show you what has been marked as [an exhibit]. Mr. Harmon just talked about it.

[Kruger]. Yes, sir.

[Sellers' counsel]. Would you describe in your own words what [the letter] represents?

[Purchaser's counsel]: Objected to, Your Honor. Improper rebuttal. He can aver or deny what is said in there, but nothing more than that.

[Sellers' counsel]: Your Honor, the whole scope of this thing was discussed.

[Purchaser's counsel]: You asked about it, I didn't.

[Sellers' counsel]: He can certainly explain what it was.

THE COURT: The letter was offered by [purchaser] without explanation. You — [sellers] opened the door and got into the contents. I'll sustain the objection.

To this point the rulings of the trial court violated § 27-613(2). See, e.g., *State v. Antillon*, 229 Neb. 348, 426 N.W.2d 533 (1988).

.

However, through persistent questioning, the sellers succeeded in putting before the jury Kruger's testimony that he had told the witness Harmon that the most sustainable of the damages calculations set forth in the letter was the replacement value method, and that because of that belief and the minimal damages associated with that method, Kruger advised against filing suit. Kruger was further permitted to testify that the cash-flow multiplier and per subscriber methods of calculating the damages were simply arguments, put in their best light, advanced by the purchaser.

The jury having been made aware of those explanations, the trial court's initial error was corrected.

### 5. MISTRIAL MOTION

The sellers also assign as error the trial court's denial of its motion for mistrial based on the asserted misconduct of the purchaser's counsel during closing argument. While the sellers made no objection during opposing counsel's closing argument and rebuttal, they did move for a mistrial after the jury was instructed and the case submitted to it. The specific grounds urged in the motion and argued in the sellers' briefs are that the purchaser, through its counsel, improperly asserted that the sellers fraudulently misrepresented the number of subscribers to be delivered and improperly commented as to witness Kruger's credibility.

In *Sandomierski v. Fixemer*, 163 Neb. 716, 719, 81 N.W.2d 142, 145 (1957), this court stated:

Whether or not an objection to the remarks of counsel made in his argument to the jury may properly be made at the close of the argument, or whether it must be done at the very time they are made, does not appear to have been decided previously by this court. We think that, for several reasons, such objection may properly be made at the close of the argument. *Our previous decisions indicate that the submission of the case to the jury without objection to such misconduct, and counsel's evident willingness to take his chances on a favorable verdict, constitute a waiver of the misconduct.* His objection at the close of the argument and before submission to the jury is in no sense a waiver

on any such basis. It could well be that any one improper statement would not constitute prejudicial error, while the cumulative effect of several would give rise to a claim of prejudice. Continued objections by counsel to prejudicial statements of opposing counsel in his argument to the jury could place the former in a less favorable position with the jury, and thus impose an unfortunate consequence upon his client which was actually caused by the wrongful conduct of opposing counsel. This he is not required to do. Attorneys engaged in the trial of cases to a jury know or ought to know the purposes of arguments to juries. When they depart from the legitimate purpose of properly presenting the evidence and the conclusions to be drawn therefrom, they must assume the responsibility for such improper conduct. They are in no position to demand that opposing counsel shall jeopardize his position with the jury by constant objections to their improper conduct.

The import of the foregoing language is that the aggrieved party may not take its chances on a favorable verdict and, after an unsuccessful outcome, complain of the opposing party's misconduct during closing argument. The motion was thus timely made in this case. However, we now conclude that the better practice is to make the motion for mistrial before the case is submitted to the jury, thereby enabling the trial court to more easily address an improper argument curable by something less drastic than the declaration of a mistrial. We therefore require that in the future, a motion for mistrial based on an opposing party's improper argument be made before the jury retires to deliberate.

Before moving on to a review of the grounds of misconduct specified in the sellers' mistrial motion, we recall that the latitude allowed one during the trial of a cause rests in the discretion of the trial court, *Billingsley v. Dutton*, 81 Neb. 667, 116 N.W. 301 (1908), and that in the absence of prejudice resulting therefrom, misconduct in argument is not a ground for reversal, *Chicago Lumber Co. v. Gibson*, 179 Neb. 461, 138 N.W.2d 832 (1965), and *Rankin v. Northern Assurance Co.*, 98 Neb. 172, 152 N.W. 324 (1915). However, a party may not induce a larger verdict by argument calculated to distract the

jury's attention from the issues or by prejudicial statements which have no support in the evidence. *Sandomierski v. Fixemer, supra*.

In connection with the first ground of misconduct asserted in the sellers' motion, the sellers point out that the purchaser, notwithstanding that the issue of liability had been determined against the sellers, nonetheless argued, without having pled fraud and in the absence of any evidential support, that the sellers had misrepresented the number of subscribers to be delivered. This assertion rests on an analogy the purchaser drew between the subject transactions and a sale of a large parcel of land.

The purchaser argued that just as a buyer of such land would not be able to tell the number of acres involved by simply looking and to some extent would have to rely on the representations made by the landowner, so, too, did the purchaser in these cases have to rely upon the representation of the number of subscribers made by the sellers. The purchaser concluded this portion of its argument by saying that if the owner of the land "didn't produce those acres, then, he's got to give [the buyer] back the money upon which that deal was based."

As the damages calculations proffered by the witnesses in these cases were all predicated on the subscriber shortfall, there was no question but that the sellers were being asked to compensate the purchaser for their failure to deliver the warranted number of subscribers. Thus, while it is true that the argument was not related to any issue before the jury and was therefore improper, the argument did nothing more than tell the jury what the evidence told the jury. Accordingly, the argument was not prejudicial.

The last specified and argued claim of misconduct rests on statements the purchaser made during argument concerning the credibility of the witness Kruger. During cross-examination, after Kruger and the purchaser's counsel sparred as to whether Kruger had refused to talk with counsel other than during a deposition, Kruger denied having left the purchaser's predecessor "in a bitter mood," and commented that purchaser's counsel would not "impune [sic] [Kruger's] honor"

or they would not "get along"; that counsel did not seem to think Kruger spoke the truth; and that what Kruger had said was "God's truth."

During argument, the purchaser's counsel stated that Kruger had lied more than once and that the jury might wonder why a former president would testify as Kruger did. Counsel further commented in that connection that he knew Kruger "had it in for Mr. Harmon, but I couldn't, for the life of me, understand why he had it in for me. He only met me once."

It is true, as the sellers argue, that under Canon 7, DR 7-106(C)(4), of the Nebraska Code of Professional Responsibility, an attorney appearing in his or her professional capacity before a tribunal shall not assert his or her personal opinion as to the credibility of a witness. However, here, the purchaser's counsel did not state his opinion as to Kruger's credibility, he simply stated it as fact that the witness had lied. In view of the sparring between counsel and Kruger during cross-examination, it cannot be said that counsel's argument in that regard was without foundation. It was for the jury to decide how to evaluate counsel's statements. See *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990) (distinguishes between statement of counsel's belief as to one's guilt and statement that evidence would demonstrate guilt). Moreover, in their argument the sellers extolled Kruger's veracity and pointed to evidence they claim corroborates his testimony.

Under the circumstances, we cannot conclude the trial court abused its discretion in overruling the sellers' motion for mistrial.

### 6. Jury Reassembly and Posttrial Motions

In the sixth and final assignment of error, the sellers assert that the trial court erred in initiating proceedings after accepting the jury's verdicts and discharging the jury, and in failing to grant their posttrial motions.

### (a) Reassembly

The sellers contend that since the purchaser's motion to correct the verdict forms was not filed until 13 days after they were returned, the motion was untimely under Neb. Rev. Stat. §§ 25-1142 and 25-1143 (Reissue 1989).

Section 25-1142 defines a new trial as "a reexamination in the same court of an issue of fact after a verdict by a jury, report of a referee, or a decision by the court." In these cases the purchaser sought not a reexamination of an issue of fact but, rather, an investigation into a possible clerical error of the jury and the correction of any such error prior to any judgments having been rendered. Therefore, the motion was not one for a new trial and was not subject to the 10-day limit on the filing of new trial motions imposed by § 25-1143.

Neb. Rev. Stat. § 25-1123 (Reissue 1989) provides that "[i]f . . . the verdict be defective in form only, the same may, with the assent of the jury before they are discharged, be corrected by the court." The essential requirement of that statute is that a verdict which appears to be defective in form not be corrected without consent of the jury. The requirement that assent occur before the jury is discharged is to assure that the jury is assembled together and agrees that there was in fact a defect in the form of its verdict. This requirement is met by reassembly of the jury. While an 82-day delay might in some instances make reassembly impossible, such did not prove to be the situation in these cases. Thus, as correction of the jury forms was requested by the reassembled jury, the corrections were made with the jury's assent before its operative discharge. At first blush, it might appear this ruling is at variance with the rationale behind the rule adopted in part III(5) above concerning motions for mistrial based on an opponent's improper argument. The difference between the two situations, however, is that while a party controls whether and when to move for a mistrial, no party controls the commission of a clerical error by a jury.

Nonetheless, the sellers, citing *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987), argue that Neb. Rev. Stat. § 27-606 (Reissue 1989) prohibits the trial court's actions. Section 27-606 reads, in pertinent part:

(2) Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or

concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him *indicating an effect of this kind* be received *for these purposes.*

(Emphasis supplied.) The sellers contend that, as interpreted by *Rahmig*, the acceptance of the jury foreman's affidavit was barred under the last sentence of § 27-606(2) and that therefore the reassembly of the jury was improper.

However, *Rahmig* held only that § 27-606(2) prohibits the use of a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstandings, thought processes, or discussions during deliberations which might enter into the verdict. It does not address the issue now before us, namely, whether a juror's affidavit may be used to establish the occurrence of a clerical error by transposition in the rendition of the verdicts against multiple defendants in a consolidated trial.

The final sentence of § 27-606(2) does not bar juror affidavits in all situations. It merely makes the restrictions on juror testimony announced in the first sentence of subsection (2) applicable to juror affidavits or other evidence of juror statements. In other words, it renders inadmissible an affidavit containing information to which a juror could not testify.

The affidavit in this case did not attempt to impeach the amount of the damages awarded. Instead, it declared that a clerical mistake was made in filling out the separate verdict forms:

3. At the end of the deliberations, we determined that the total amount of damages sustained by [the purchaser] as a result of the two [sellers'] actions was $119,800.00. This was the unanimous agreement of all the jurors. We then apportioned $110,800.00 in damages against [the corporate seller] and $9,000.00 against [the partnership seller].

4. In completing the verdict forms, I [the foreman]

inadvertently placed the $110,800.00 figure on the verdict form for [the partnership seller] . . . and the $9,000.00 figure on the verdict form for [the corporate seller] . . . . In so doing, I placed the allocated damage figure on the wrong verdict forms.

Section 27-606, enacted by the Legislature in 1975 Neb. Laws, L.B. 279, is similar to Fed. R. Evid. 606. The first sentence of § 27-606(2) is identical to the first sentence of rule 606(b) as it was adopted by Congress in 1975. (In 1987, rule 606 was amended to make it gender neutral; however, no substantive change to the rule has been made since its adoption.) See 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 606 (1990). The second sentence of § 27-606(2) is identical to the second sentence of the initial House of Representatives version of rule 606(b), a version never adopted by the entire Congress. See 3 J. Weinstein & M. Berger, *supra*, ¶¶ 606 and 606[08]. As adopted by Congress, the second sentence of rule 606(b) reads: "Nor may his affidavit or evidence of any statement by him *concerning a matter about which he would be precluded from testifying* be received for these purposes." (Emphasis supplied.) 28 U.S.C. app. (1982). The differences in the adopted and unadopted versions of the federal rule are cosmetic, not substantive.

Decisions from other jurisdictions with similar rules are also enlightening. In *Prendergast v. Smith Laboratories, Inc.*, 440 N.W.2d 880 (Iowa 1989), the Iowa Supreme Court held that Iowa's version of rule 606(b) did not bar the receipt of juror testimony to demonstrate a mistake in the completion of special verdict forms. The Colorado Court of Appeals ruled that Colorado's version of rule 606(b) does not preclude inquiry into possible clerical mistakes in filling out the dollar amounts for two separate causes of action on the wrong verdict forms. *Kading v. Kading*, 683 P.2d 373 (Colo. App. 1984).

In *Attridge v. Cencorp Div. of Dover Tech. Intern.*, 836 F.2d 113 (2d Cir. 1987), the court approved of the district court's reformation of a verdict based on posttrial interviews of the jurors, holding that rule 606(b) did not apply in situations where juror evidence is received to show that "the verdict delivered was not that actually agreed upon." 836 F.2d at 116.

The U.S. Court of Appeals for the Fifth Circuit has ruled similarly. See *U.S. v. Dotson*, 817 F.2d 1127 (5th Cir. 1987), *modified on other grounds* 821 F.2d 1034. Such a view of rule 606(b) and the various state versions of that rule are also shared by commentators. See, e.g., 3 J. Weinstein & M. Berger, *supra*, ¶ 606[04]; 1 G. Joseph & S. Saltzburg, Evidence in America: The Federal Rules in the States § 40.3 (1987).

However, at least two states with versions of rule 606 have concluded otherwise. "To admit affidavits of jurors to correct a mistake in recording the verdict would permit all losing parties to attack verdicts, thereby vitiating the finality and definitiveness of a judgment." *Cyr v. Michaud*, 454 A.2d 1376, 1383 (Me. 1983). "Regardless of the rule in other jurisdictions, in Maryland it is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake." *Oxtoby v. McGowan*, 294 Md. 83, 101, 447 A.2d 860, 870 (1982).

These holdings are tempered by the fact that they did not arise out of factual circumstances analogous to those presently before us. In *Cyr, supra,* there was an attempt to show that the jury had in fact meant to award a substantially lower amount than was awarded. This allegedly occurred when the jury entered a $20,000 figure into a verdict form which asked by what amount total damages in the case (allegedly found to be $100,000 by the jurors) were to be reduced. The affidavits purported to show that the jury intended the award itself to be $20,000, not $80,000 (arrived at by reducing $100,000 by $20,000). In *Oxtoby, supra,* the appellants were attempting to introduce evidence of juror coercion and juror use of a textbook not admitted at trial.

Prior to the enactment of § 27-606, Nebraska adhered to the general rule that

> affidavits or other sworn statements of jurors will not be received to impeach or explain a verdict, to show on what grounds it was rendered, to show a mistake in it, to show the jurors misunderstood the charge of the court, or to show they mistook the law or the result of the finding because such matters inhere in the verdict.

*Selders v. Armentrout*, 192 Neb. 291, 294, 220 N.W.2d 222, 224

(1974).

The general rule that juror affidavits will not be allowed to impeach a verdict dates back centuries. Prior to 1785, there was no common-law rule explicitly prohibiting the receipt of juror testimony. See *McDonald v. Pless*, 238 U.S. 264, 35 S. Ct. 783, 59 L. Ed. 1300 (1915). In 1785, however, Lord Mansfield refused to accept juror affidavits which indicated that the jury had decided a case by the casting of lots. See *Vaise v. Delaval*, 1 T.R. 11 (1785), reprinted in 99 Eng. Rep. 944. As stated by the U.S. Supreme Court in *McDonald, supra* at 264 U.S. at 268, "That ruling soon came to be almost universally followed in England and in this country." *McDonald*, which dealt with an alleged quotient verdict, has become notable for the following passage, relied on in part by the sellers in this case:

> If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

*McDonald* at 238 U.S. at 267-68, quoted in, e.g., *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987), and *Attridge v. Cencorp. Div. of Dover Tech. Intern.*, 836 F.2d 113 (2d Cir. 1987). However, *Vaise, supra*, and *McDonald, supra*, were attempts to impeach the mental process by which those verdicts were rendered, not examples of clerical errors

made in the filling out of a verdict form.

Many courts, without discussion of rule 606(b), have specifically recognized that postverdict evidence from jurors of clerical errors made in the rendition of a verdict may be admitted. See, e.g., *Erickson by Erickson v. Hammermeister*, 458 N.W.2d 172 (Minn. App. 1990); *McStocker v. Kolment*, 160 A.D.2d 980, 554 N.Y.S.2d 702 (1990); *Colling v Avon Disposal, Inc.*, 179 Mich. App. 796, 446 N.W.2d 361 (1989); *Bianchi v. Nordby*, 409 N.W.2d 835 (Minn. 1987); *Rodriguez v. Baker*, 91 A.D.2d 143, 457 N.Y.S.2d 801 (1983); *Rose v. Thau*, 45 A.D.2d 182, 357 N.Y.S.2d 201 (1974); *Kink v. Combs*, 28 Wis. 2d 65, 135 N.W.2d 789 (1965); *Southern Pacific Railroad Co. v. Mitchell*, 80 Ariz. 50, 292 P.2d 827 (1956); *Hopkinson's Admx. et als. v. S. D. Stocker*, 116 Vt. 98, 70 A.2d 587 (1950); *Young v. United States*, 163 F.2d 187 (10th Cir. 1947), *cert. denied* 332 U.S. 770, 68 S. Ct. 83, 92 L. Ed. 355 and 334 U.S. 859, 68 S. Ct. 1533, 92 L. Ed. 1779 (1948). The statement of the Vermont Supreme Court in *Hopkinson's Admx. et als., supra* at 101-02, 70 A.2d at 589, is as sound now as it was when announced over 40 years ago:

> The general principle that the statements of the jurors will not be received to establish their own misconduct is, as a rule, considered as not preventing the reception of their evidence as to what really was the verdict agreed upon, in order to prove that, through mistake or otherwise, it has not been correctly expressed.

We therefore conclude the trial court properly considered and acted upon the foreman's affidavit.

### (b) Posttrial Motions

In view of the foregoing, we determine that the trial court properly overruled the sellers' motions for judgments notwithstanding the verdicts or, in the alternative, for a new trial.

### IV. ANALYSIS OF CROSS-APPEAL

Finally, we come to the purchaser's cross-appeal. It is the purchaser's position that its letter of December 3, 1985, notifying the sellers that it was exercising its right to set off damages suffered against amounts owing on the notes, as

described in part II above, acted as a discharge of the notes, and, thus, no interest could run on those amounts from that time on.

In support of its assertion, the purchaser cites us to Neb. U.C.C. § 3-601(2) (Reissue 1980), which reads: "Any party is also discharged from his liability on an instrument to another party by any other act or agreement with such party which would discharge his simple contract for the payment of money." The purchaser argues that by announcing its intention to set off against the amounts due under the notes its damages resulting from the sellers' breaches under the purchase and sale agreements, the notes were discharged pursuant to § 3-601(2).

However, the purchaser ignores § 3-601(1), which provides: "The extent of the discharge of any party from liability on an instrument is governed by the sections on (a) payment or *satisfaction* (Section 3-603) . . . ." (Emphasis supplied.) While "satisfaction" is not defined in article 3 of the code, under the common law a setoff is a means of satisfaction of a debt. See, e.g., *Rohn v. Kelley*, 156 Neb. 463, 56 N.W.2d 711 (1953), *cert. denied* 346 U.S. 854, 74 S. Ct. 68, 98 L. Ed. 368, *disapproved on unrelated grounds, Lambie v. Stahl*, 178 Neb. 506, 134 N.W.2d 86 (1965); *State ex rel. Bates v. Morgan*, 154 Neb. 234, 47 N.W.2d 512 (1951). See, also, *Barkei v. Delnor Hosp.*, 207 Ill. App. 3d 255, 565 N.E.2d 708 (1990); *Security Pacific Nat. Bank v. Wozab*, 51 Cal. 3d 991, 800 P.2d 557, 275 Cal. Rptr. 201 (1990); *Bank of Kansas v. Hutchinson Health Services, Inc.*, 13 Kan. App. 2d 421, 773 P.2d 660 (1989), *aff'd* 246 Kan. 83, 785 P.2d 1349 (1990). Therefore, the situation before us falls within the purview of § 3-601(1)(a) and its referent, Neb. U.C.C. § 3-603 (Reissue 1980).

Section 3-603(1) provides, in pertinent part: "The liability of any party is discharged *to the extent of his* payment or *satisfaction* to the holder . . . ." (Emphasis supplied.) Comment 3 to this section states, in relevant part: "Payment to the holder discharges the party who makes it from his own liability on the instrument, and a part payment discharges him pro tanto. *The same is true of any other satisfaction.*" (Emphasis supplied.) The terms of § 3-603(1) are specifically applicable to these cases.

Because these cases fall within the scope of § 3-603, § 3-601(2) does not come into play. The latter section is, in effect, a "catchall" provision which recognizes the possibility that a debt might be discharged by some means other than those encompassed in § 3-601(1)(a) through (i). See 5 W. Hawkland & L. Lawrence, Uniform Commercial Code Series § 3-601:03 (1984).

Therefore, in the action against the corporate seller, the purchaser is entitled to a discharge from liability on its note to that seller, originally worth $5,000, against the damages the purchaser was awarded against that seller. Likewise, in the action against the partnership seller, the purchaser is entitled to a discharge from liability on its note to that seller, originally worth $20,000, against the damages the purchaser was awarded against that seller. However, the question remains as to what interest accrues under the notes.

In *York Plmb. v. Groussman Inv.*, 166 Colo. 382, 443 P.2d 986 (1968), the Colorado Supreme Court was presented with a similar set of circumstances. Therein, the contractor had performed various plumbing, heating, and ventilating jobs for the owner, totaling $83,260.59. The owners paid $74,108.55 upon completion of the work, and the contractor filed a mechanic's lien on the balance of $9,152.04. The owners claimed that the contractor had breached its warranty with respect to some of the work done and asserted a right to a setoff of $3,242.80, thus claiming that the unpaid balance had been reduced to $5,909.24. The owners then proffered a check of $5,909.24 to the contractor. The contractor rejected the check and filed suit to collect on its lien.

The trial court found that the owners' offer of the check was ineffectual as a tender of payment, further finding that the owners were entitled to a setoff of $1,741.05. The trial court also found that the contractor's entire claim under the mechanic's lien was unliquidated until the judgment was rendered and that the contractor was therefore not entitled to interest prior to judgment.

The Colorado Supreme Court reversed that portion of the trial court's judgment denying the contractor any interest. In so deciding, the court made the following statements at 166 Colo.

at 385, 443 P.2d at 987:

> [The owners] argue that the unliquidated character of the claim for damages for breach of warranty makes the [contractor's] claim undetermined and unliquidated until final judgment. We do not agree. In *F. & C. C. R. Co. v. Tennant*, 32 Colo. 71, 75 P. 410, this court stated that, "Debtors cannot avoid the payment of interest by disputing the account, and when at the trial the account or any portion of it is established, the creditor is entitled to interest upon the amount found to be due." And in *Henrylyn Co. v. Meneray Co.*, 55 Colo. 438, 135 P. 980, the court again stated that, "Certainly a debtor cannot defeat the running of interest against him for the part of a debt which he admits that he owes, and which would otherwise draw interest, by simply making a claim of an unliquidated set-off against the whole debt."

Having decided that the accrual of interest could not be thus avoided, the Colorado court went on to limit its holding:

> While the authorities are not uniform, we think the better rule permits the offset of an unliquidated claim against a liquidated claim before the computation of interest, at least in situations in which the two claims arise out of the same general transaction. "Where a claim under an agreement is certain and liquidated, but is reduced because of the allowance of an unliquidated off-set or counterclaim, *interest may be allowed only on the balance due*." [Citations omitted.]

(Emphasis supplied.) *Id.* at 386, 443 P.2d at 988. Accord, *Hollon v. McComb*, 636 P.2d 513 (Wyo. 1981); *Fairway Builders, Inc. v. Malouf, etc.*, 124 Ariz. 242, 603 P.2d 513 (1979); *Fluor Corp. v. United States ex rel. Mosher Steel Co.*, 405 F.2d 823 (9th Cir. 1969), *cert. denied* 394 U.S. 1014, 89 S. Ct. 1632, 23 L. Ed. 2d 40; *Farrington v. Freeman*, 251 Iowa 18, 99 N.W.2d 388 (1959).

We find the reasoning of the Colorado Supreme Court persuasive. Accordingly, we hold that where a liquidated claim held by one party and an unliquidated claim held by a competing party are set off against one another, and the claims arose from the same transaction, interest on the liquidated

claim may be allowed only on any balance due after the setoff.

The purchaser's belief that it must account for interest on the entire amount of each note for the period of time between the execution of the notes and its notification to the sellers of the breach of warranties under the contracts is unwarranted. The purchaser suffered its damages as of the date of closing, which coincided with the date on which the notes were executed. Therefore, as of that day, November 5, 1985, the purchaser had unliquidated claims against the sellers. The date of notification is irrelevant. The sellers are entitled only to interest accruing on the notes after the purchaser's damages are set off in each case.

Therefore, in the action against the corporate seller, deducting the purchaser's obligation on its $5,000 note from the $111,763 damages awarded it leaves a $106,763 balance due the purchaser on the corporate seller's liquidated claim, and the seller is entitled to no interest. Accordingly, the trial court should have entered judgment in favor of the purchaser against the corporate seller in the amount of $106,763.

In the action against the partnership seller, the purchaser was awarded a total of $10,854. In this case, the purchaser had given a $20,000 note. Deducting the purchaser's damages award from the amount of the note leaves a balance of $9,146 not discharged and thus due the partnership seller. Accordingly, the trial court should have entered judgment in favor of the partnership seller in the amount of $9,146 plus interest in accordance with the terms of the note, to run from the date the purchaser executed the note.

## V. DECISION

Accordingly, we vacate the judgments of the trial court and remand the causes with the direction that judgments be entered in accordance with this opinion.

JUDGMENTS VACATED, AND CAUSES
REMANDED WITH DIRECTION.