FIRST NATIONAL BANK OF OMAHA, A NATIONAL BANKING CORPORATION, APPELLEE, V. ACCEPTANCE INSURANCE COMPANIES, INC., A DELAWARE CORPORATION, APPELLANT AND CROSS-APPELLEE, AND ROBERT F. SWARTZBAUGH, APPELLEE AND CROSS-APPELLANT.

675 N.W.2d 689

Filed January 27, 2004. No. A-02-207.

354

James M. Bausch, Tracy A. Oldemeyer, and Pamela K. Epp, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellant.

Charles F. Gotch and David A. Blagg, of Cassem, Tierney, Adams, Gotch & Douglas, for appellee Robert F. Swartzbaugh.

HANNON and INBODY, Judges, and BUCKLEY, District Judge, Retired.

HANNON, Judge.

## I. INTRODUCTION

This action commenced with a petition of interpleader filed by the First National Bank of Omaha (FNB) asking the court to determine the ownership of approximately 20,396 shares of Acceptance Insurance Companies, Inc. (Acceptance), common stock which FNB was holding in escrow under agreements between Acceptance, Robert F. Swartzbaugh, and others. The litigated issues were between Acceptance and Swartzbaugh over the right to the shares and Swartzbaugh's claim for damages for Acceptance's alleged conversion of those shares. The trial court determined that Swartzbaugh was entitled to possession of the shares because Acceptance had not made a timely claim for damages under the applicable agreements and that by asserting its late claim, Acceptance had converted those shares. It ordered the shares distributed to Swartzbaugh, awarded him damages for the difference between the value it determined the shares had when Acceptance made the claim and their value when delivered, denied him damages for his loss of use claim, and awarded him attorney fees under Neb. Rev. Stat. § 25-824 (Reissue 1995) upon a finding that Acceptance's claim was without merit. We conclude that because Acceptance's claim was not asserted in accordance with the parties' agreement, Acceptance lost its claim to the stock, but we further conclude that Acceptance's claim did not amount to a conversion of the shares claimed and that an award of attorney fees was improper. Accordingly, we affirm in part, and in part reverse and remand with directions.

## II. BACKGROUND

In July 1993, Acceptance; the Redland Group, Inc. (Redland); and those Redland shareholders in agreement entered into a written exchange agreement (the Exchange Agreement) under which Acceptance acquired ownership of Redland stock by the trade of shares of Acceptance for shares of Redland held by its shareholders. Swartzbaugh was a large shareholder of Redland and one of those who agreed to the exchange. Under the Exchange Agreement, 240,000 shares of Acceptance, which shares would otherwise have gone to Redland shareholders, were placed in escrow with FNB to secure payment of the damages to which Acceptance might be entitled for breaches of the Exchange Agreement, as defined by that agreement. A separate but integrated escrow agreement (the Escrow Agreement) established how many of the 240,000 shares each Redland shareholder owned and would receive out of escrow if Acceptance did not prove to be entitled to them to cover damages as defined in the Exchange Agreement. If Acceptance's claim for damages proved to be less than the value of the 240,000 shares, the balance of the shares was to be distributed to the shareholders pro rata. Under the Escrow Agreement, Swartzbaugh was to receive 20,396.82 of the escrowed shares if no damages were assessed.

The Escrow Agreement also provided that FNB would distribute the shares on June 30, 1996, unless on or before that date, Acceptance notified Redland, the shareholders, and FNB in writing of any claims as permitted under article X of the Exchange Agreement. The required contents of the written notice were specified, and the amount of damages claimed was required to be stated. Acceptance did not make a written claim by June 30, but FNB did not distribute the shares on that date. Further pertinent details of these agreements will be stated below when they are applicable to the issues under consideration.

Shortly after June 30, 1996, Acceptance made a claim for damages. Considerable negotiations followed. Acceptance settled with many of the individual shareholders, and their respective shares were distributed to them. Swartzbaugh did not agree to the settlement, and FNB held his shares and ultimately filed this interpleader action.

The issues of this action were framed by the pleadings of Acceptance and Swartzbaugh. Acceptance pled that a committee of Redland shareholders had settled matters concerning Acceptance's claim against the stock; that under the settlement, Swartzbaugh was entitled to 7,095 shares and Acceptance was entitled to 13,301 shares; that Swartzbaugh was bound by that settlement; and that he had also settled all claims against Acceptance in separate litigation. Acceptance prayed that FNB be ordered to distribute the shares in accordance with agreements made by the other shareholders.

Swartzbaugh's pleadings denied that any settlement binding upon him had been made and requested that the 20,396.82 shares be ordered distributed to him. He also filed a cross-petition seeking damages from Acceptance for converting his shares by its claim against them. He alleged that under the Escrow Agreement, Acceptance was required to assert any claim to the escrowed stock on or before June 30, 1996; that it did not assert a claim until July 5, 1996; and that this untimely assertion was wrongful, was without just cause, and caused FNB not to deliver his stock. He alleged that Acceptance's assertion and its claimed possessory right constituted a conversion of the shares by Acceptance, "depriving [him] of his possessory right to exercise all elements of ownership over said shares"; that he had demanded that FNB deliver possession of the shares; and that Acceptance had demanded that they not be delivered. He claimed damages equal to the difference between the value of the shares at the time their possession should have been delivered to him and their fair market value on the day their possession is actually delivered to him, "plus the value of [his] loss of use of the shares." He alleged that he was required to expend costs and attorney fees in the action and prayed to be awarded damages and attorney fees, but he did not allege any additional facts to justify the allowance of the attorney fees. In reply to Swartzbaugh's pleading, Acceptance pled a list of conclusions: consent, accord and satisfaction, compromise and settlement, waiver, and estoppel.

Acceptance filed a motion for summary judgment, and Swartzbaugh filed a motion for partial summary judgment; the trial court granted Swartzbaugh's motion and determined that the 20,396.82 escrowed shares should have been delivered to

him. It denied Acceptance's motion for summary judgment that asked for an order directing delivery of the shares in accordance with the settlement agreement of the shareholder committee. There were several issues ruled upon by the trial court's grant of partial summary judgment to Swartzbaugh, but the issues related to Swartzbaugh's claim for damages and attorney fees remained. These issues were settled by a trial to the court.

After a trial on the damage issues, the court awarded Swartzbaugh a judgment for the diminution in the value of the stock: It determined that the stock had a value on July 5, 1996, of $18.25 per share, and it awarded Swartzbaugh a judgment against Acceptance for the difference between that value and the value the stock would have on the day when it is actually delivered to Swartzbaugh, as determined by the closing price on the date of that delivery according to the Wall Street Journal. The court denied prejudgment interest, but it found that Acceptance's position in the lawsuit was wholly without merit and awarded Swartzbaugh $149,364 for attorney fees and $2,518.85 for costs.

### III. ASSIGNMENTS OF ERROR

Acceptance alleges, reorganized and restated, that the trial court erred (1) in granting Swartzbaugh's motion for partial summary judgment and denying Acceptance's motion for summary judgment, (2) in awarding Swartzbaugh damages on the theory of conversion, and (3) in awarding Swartzbaugh attorney fees and costs under § 25-824. Acceptance raises more than one issue under each alleged error, and Swartzbaugh supported the trial court's action under more than one theory. On his cross-appeal, Swartzbaugh alleges that the trial court erred in refusing to award him damages for his loss of the use of the stock in addition to the other damages it did award him.

The issues of this appeal can be most efficiently considered by dividing them into four areas: One, was Swartzbaugh entitled to have the 20,396.82 shares of Acceptance stock distributed to him under the Escrow Agreement because Acceptance did not make a timely claim for damages; two, if Swartzbaugh had such an entitlement, did he lose it by settlement or waiver in a separate action; three, if Swartzbaugh was entitled to have the stock distributed to him, can he recover the stock, damages for its conversion plus

interest, and damages for the loss of its use; and, four, was an award of attorney fees and costs under § 25-824 proper?

## IV. ANALYSIS

### 1. SWARTZBAUGH'S RIGHT TO POSSESSION OF STOCK

#### (a) Standard of Review

 The trial court settled the issue of Swartzbaugh's right to the 20,396.82 shares by ruling on motions for summary judgment. Therefore, our standard of review on that issue is that which applies to the review of grants and denials of summary judgment. Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Bennett v. Labenz*, 265 Neb. 750, 659 N.W.2d 339 (2003). In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.*

A question of law raised in the course of consideration of a motion for summary judgment, as with any question of law, must be decided by the appellate court without reference to the decision of the trial court. See *Essen v. Gilmore*, 259 Neb. 55, 607 N.W.2d 829 (2000).

#### (b) Escrow Agreement

Section 10.3 of article X of the Exchange Agreement provided for the establishment of the escrow account of Acceptance shares to be withheld from distribution, "against which Acceptance may assert claims for indemnification under the provisions of this Agreement and the Escrow Agreement." On July 19, 1993, FNB, Acceptance, and the Redland shareholders acting through their authorized representative, John P. Nelson, entered into the Escrow Agreement. This agreement specified the procedure Acceptance was to follow in making a claim against the escrowed shares, and it provided in significant part:

> The Escrow Agent will, on June 30, 1996, distribute the Escrowed Shares to the Shareholders . . . unless, on or

before that date, Acceptance notifies Redland and the Shareholders, and [FNB,] in writing of any claims it asserts against the Escrowed Shares as permitted by Article X of the Exchange Agreement.

Article X of the Exchange Agreement was a complicated piece of legal draftsmanship. Basically, it provided that claims by Acceptance under several paragraphs of the Exchange Agreement would survive closing until the expiration of any applicable limitation period, but not beyond June 30, 1996. It also provided that certain claims, such as fraud, would survive "until the expiration of any applicable limitations period." It further stated that Redland shareholders shall indemnify Acceptance from all damages, but only to the extent of the value of the shares held in escrow. It provided that "the difference between Pro Forma Book Value (as defined in Section 3.8 [of article III of the Exchange Agreement]) and $6.5 million shall constitute a deductible . . . against the aggregate Damages claims for which the Redland Shareholders shall be liable." The share exchange occurred on July 19, 1993.

The Escrow Agreement also set forth the nature of the required written notice:

If and when Acceptance shall claim entitlement to some or all of the Escrowed Shares . . . Acceptance shall send written notice of the same to the Escrow Agent and the Shareholders. Such notice of claim will set forth (i) the nature of the claim, (ii) the amount of the claim, (iii) the facts and circumstances upon which the claim is based, and (iv) such other information as may be appropriate to an understanding of the nature and amount of the claim asserted by Acceptance.

The Escrow Agreement further provided that if Acceptance made a claim against the escrowed shares, FNB, as the escrow agent, would release the shares claimed within 15 days of receipt of the claim unless Nelson, the shareholders' authorized representative, objected to the claim in writing before the expiration of those 15 days.

The Escrow Agreement stated that in the event that Nelson objected,

Acceptance and the Authorized Representative shall use their best efforts to resolve all disputes involving any claims

asserted by Acceptance against the Escrowed Shares. If such disputes are resolved by agreement, Acceptance and Authorized Representative will advise the Escrow Agent in writing and provide written instructions regarding distribution of the Escrowed Shares.

If any dispute were not settled by June 30, 1996, such dispute would be submitted to arbitration.

### (c) Notice of Claim by Acceptance

The Exchange Agreement effectively stated that the book value of the Redland stock was $6.5 million or greater and that the stock held in escrow was intended to secure the Redland sellers' warranty to that effect. The value of the 240,000 shares of stock held in escrow was thought by Acceptance to be $3 million, which thus would secure the warranties of the Redland shareholders in the amount of $3 million, the amount by which Acceptance felt the book value of Redland might be overstated. Acceptance maintains that by May 31, 1996, it had information showing that the book value, due to understated losses before December 31, 1992, might be understated by more than $3 million. Acceptance admitted that it did not make a written claim before June 30, 1996, as required by the Escrow Agreement, but before that date, Acceptance had told Nelson, the Redland shareholders' authorized representative, that it would make a claim in excess of $3 million against the 240,000 escrowed shares due to "loss development" and that a trust officer of FNB had been notified.

The evidence shows that on July 5, 1996, Acceptance's general counsel sent FNB a letter stating that Acceptance was making a claim for the 240,000 shares of stock held in escrow under article X of the Exchange Agreement and that copies of the letter were sent to the chairman of Acceptance and to Nelson. The letter claimed that its effective date was June 30. On July 9, a more formal notice was given to FNB by a letter from a lawyer representing Acceptance.

The first question is whether by failing to present its claim by June 30, 1996, Acceptance lost its right to present the claim under the Escrow Agreement. Acceptance argues that the notice was adequate because FNB and Nelson knew of its claim before that

date. Acceptance does not support that assertion with argument or authority, and we do not hesitate to reject it without explanation or authority, because such notice clearly did not comply with the Escrow Agreement and could not reasonably have been expected to accomplish what the agreement clearly required.

Acceptance argues that notice on July 5, 1996, was timely because the agreements did not provide that time was of the essence. It cites *Dowd Grain Co., Inc. v. Pflug*, 193 Neb. 483, 227 N.W.2d 610 (1975), and other cases for the proposition that time is not of the essence unless the instrument so provides and *Pettit v. Paxton*, 255 Neb. 279, 583 N.W.2d 604 (1998), for the proposition that time is not made of the essence merely because a date for some action is specified.

Relying upon *Frenzen v. Taylor*, 232 Neb. 41, 439 N.W.2d 473 (1989), the *Pettit* court held that a real estate contract which provided for a specific closing date required closing within a reasonable time after that date unless the contract provided that time was of the essence. The *Frenzen* case and the authority cited and discussed therein are concerned with provisions for a closing date in contracts for the sale of realty. Swartzbaugh's counsel points out that the Escrow Agreement provided that FNB would distribute the shares "unless" Acceptance gave notice before June 30, 1996, and cites cases holding that the use of the word "unless" creates a condition. Swartzbaugh's counsel cites *Long v. Magnolia Petroleum Co.*, 166 Neb. 410, 89 N.W.2d 245 (1958) (drill-or-pay oil leases containing provision that without drilling, lease would terminate unless certain delayed rents were paid by certain day, created condition that payment before required day was necessary to prevent termination) and *Wolf v. Tastee Freez Corp.*, 172 Neb. 430, 109 N.W.2d 733 (1961) (lease extension notice that was served 1 day late under lease was held ineffective).

Swartzbaugh's counsel also cites *Harmon Cable Communications v. Scope Cable Television*, 237 Neb. 871, 881, 468 N.W.2d 350, 358 (1991), where a provision in a sales agreement that the purchaser " 'shall assert any claim or claims for indemnification' " (emphasis omitted) against the seller by giving notice within 30 days of discovery, but not later than 18 months from closing, was held on a summary judgment to be a promise

and not a condition. The *Harmon Cable Communications* court made that conclusion in the absence of any language indicating a condition. Swartzbaugh's counsel relies upon the *Harmon Cable Communications* court's statement:

> Whether contractual language is deemed conditional or promissory generally depends upon the intention of the parties. [Citations omitted.] Where the intent of the parties is not clear, the disputed language is generally deemed to be promissory rather than conditional. [Citations omitted.] Terms such as "if," "provided that," "when," "after," "as soon as," "subject to," "on condition that," or some similar phrase are evidence that performance of a contractual provision is a condition.

237 Neb. at 883, 468 N.W.2d at 359.

We agree that as used in the Escrow Agreement, the word "unless" clearly establishes a condition. We also point out that a close reading of the terms of article X of the Exchange Agreement shows that for the most part, Acceptance's claims for breach (unlike any claims for fraud) were not permitted to survive beyond the date of the exchange, which was July 19, 1993, unless made by June 30, 1996. This is a further clear indication that the parties did intend claims not disclosed as provided in the Escrow Agreement to have been lost and that therefore, there was no need for FNB to hold the stock beyond that date.

Swartzbaugh also argues that the particular claim put forth in the belated notice was not based upon grounds recognized in the Escrow Agreement. We decline to consider that issue, because it is unnecessary to the resolution of this appeal. See *Kelly v. Kelly*, 246 Neb. 55, 516 N.W.2d 612 (1994) (appellate court is not obligated to engage in analysis which is not needed to adjudicate case and controversy before it).

We therefore conclude that by failing to make its claim in the manner provided in the Escrow Agreement, Acceptance lost its right to advance that claim.

(d) Whether Swartzbaugh Lost His Right to Possession by
Shareholder Committee's Settlement With Acceptance

Acceptance claims that Swartzbaugh lost his right to the shares by an agreement made by others. Acceptance argues that the

settlement between it and all the Redland shareholders except Swartzbaugh was made by a shareholder committee that succeeded Nelson as the authorized representative of all the Redland shareholders and was therefore binding upon Swartzbaugh. The evidence is clear that Swartzbaugh participated in settlement negotiations and that all of the Redland shareholders except Swartzbaugh settled with Acceptance. It is also clear that Swartzbaugh personally never agreed to accept the terms of the final settlement. The issue is whether he is bound by an agreement made by a committee allegedly selected by the shareholders.

Some background will be helpful. Section 7.9 of article VII of the Exchange Agreement provided that the Redland shareholders appointed Nelson as their attorney in fact "to execute and deliver on behalf of [each] Redland Shareholder [who signed the Exchange Agreement] such additional agreements (including, without limitation, the Escrow Agreement), certificates or other documents [as were] required in connection with the Exchange or the Closing thereof." The Escrow Agreement similarly appointed Nelson as the authorized representative of Redland shareholders and provided that if "he is unwilling or unable to serve, a successor Authorized Representative shall be appointed by a vote of the holders of a majority of the Acceptance Common Stock held [in escrow]."

Nelson was an officer of Acceptance and had more shares held in escrow than did Swartzbaugh, and therefore, Nelson had a serious conflict in settling the dispute and resigned as authorized representative on July 22, 1996. On that day, the shareholders met. The minutes of that meeting show that 9 of the 26 Redland shareholders were present. Swartzbaugh and Nelson are shown present, but Nelson left before the shareholders took action. The minutes reflect that it was decided that a committee would represent the shareholders; that it would consist of five persons, including Swartzbaugh; that it "would have the authority to act on behalf of all of the shareholders in this matter[;] and that [it would] report the results of [its] efforts in a reasonable and timely ma[nn]er to all other shareholders." We will continue to refer to the five selected shareholders as "the shareholder committee." The July 24 minutes of that committee include the statement: "The committee decided that Rick Gibson and Joe

Smith would act as Co-Chairs of the committee. It was unanimously agreed by the committee that each member of the committee would have one vote and [that] a simple majority would prevail." Later, when the chairman of Acceptance questioned the shareholder committee's authority, the response of an attorney representing the shareholder committee summarized the foregoing activity but did not assert that this activity did or did not give the committee authority.

Over a period of time, the shareholder committee hired accountants and the aforementioned lawyer to assess the shareholders' position and negotiated with Acceptance to settle the dispute. Offers and counteroffers were made, and Swartzbaugh participated in them, voting in favor of some and against some. No final settlement was reached between the shareholder committee and Acceptance until Acceptance made a counteroffer (subject to the approval of its board of directors); the shareholder committee voted on March 10, 1997, to accept the counteroffer, with Swartzbaugh abstaining. All of the shareholders then met and ratified the shareholder committee's action, while Swartzbaugh again abstained. On March 14, Swartzbaugh's personal lawyer wrote to the lawyer representing the shareholders for an explanation of the effect of the settlement and the expected steps to complete it. Acceptance's board of directors refused to approve this settlement.

Further negotiations were had, and on June 30, 1997, the shareholder committee, voting four to one, accepted the terms that were finally agreed upon. Swartzbaugh did not agree to the terms of this settlement.

Under date of August 22, 1997, Acceptance and the Redland shareholders purportedly signed, through the shareholder committee, a "Settlement Agreement" that provided for a pro rata distribution of the shares in escrow, part to Acceptance and part to the 26 shareholders. The agreement provided that Swartzbaugh's prorated share was 7,095 shares. The settlement agreement was signed by four members of the shareholder committee, but not by Swartzbaugh. A "Receipt and Mutual Release" was also signed by each of the 26 shareholders, except Swartzbaugh, and by Acceptance. Each release provided that as regarded the disagreement over Acceptance's claim, the authority of the shareholder

committee to settle was recognized, and that Acceptance and the shareholder each granted a broad release to the other. Swartzbaugh did not sign a release, and his shares are still held in escrow. Acceptance argues that the settlement is binding on Swartzbaugh because the shareholder committee had apparent and express authority to represent Swartzbaugh in the settlement.

The principal basis for the claim that the committee had express or actual authority to settle was that the committee was Nelson's successor. Acceptance argues that the Exchange Agreement and the Escrow Agreement appointed Nelson as the Redland shareholders' attorney in fact and authorized representative and that as his successor under such agreements, the shareholder committee acceded to his power. The Exchange Agreement provided:

> Each [shareholder who signs the Exchange Agreement] appoints . . . Nelson, as attorney-in-fact . . . to agree to and execute on behalf of such Redland Shareholder amendments to this Agreement and to execute and deliver on behalf of [him or her] such additional agreements (including, without limitation, the Escrow Agreement), certificates or other documents [as are] required in connection with the Exchange or the Closing thereof.

Several provisions of the Escrow Agreement touched on Nelson's power to negotiate. Paragraph 3 provided that FNB, as the escrow agent, would distribute the shares on June 30, 1996, unless Acceptance notified Redland, Redland's shareholders, and FNB of a claim under article X of the Exchange Agreement. Subparagraphs 4(a) and (b) provided for the form of Acceptance's claim, for notice, and for partial distribution of the shares if the claim were for less than the agreed-upon value of the shares. Subparagraph 4(c) provided:

> Acceptance and the Authorized Representative shall use their best efforts to resolve all disputes involving any claims asserted by Acceptance against the Escrowed Shares. If such disputes are resolved by agreement, Acceptance and the Authorized Representative will advise the Escrow Agent in writing and provide written instructions regarding distribution of the Escrowed Shares. If such disputes are not resolved by agreement of Acceptance and the Authorized

Representative by June 30, 1996, then the matter of such dispute shall be submitted to arbitration as provided for in Section 5 [of the Escrow Agreement].

The Escrow Agreement also contained the following definitions:

15. Authorized Representative. The authorized representative is . . . Nelson. If, prior to the termination of the escrow established by this Agreement, he is unwilling or unable to serve, a successor Authorized Representative shall be appointed by a vote of the holders of a majority of the Acceptance Common Stock held on the Effective Date of this Agreement as reflected in Schedule A.

16. Termination. This Agreement shall terminate upon the distribution by the Escrow Agent of all of the Escrowed Shares.

Without dispute, Nelson resigned as authorized representative on July 22, 1996. Acceptance argues that under the provisions quoted above, Nelson had the authority to settle disputes regarding its claim and that as his successor, the shareholder committee obtained the same power to settle as Nelson had before he resigned. We agree that subparagraph 4(c) of the Escrow Agreement gave Nelson authority to settle disputes concerning Acceptance's claim, but that authority was not unlimited with respect to time. That subparagraph specifically provided that if the dispute were not settled by June 30, the matter would be submitted to arbitration; and the next subparagraph provided for FNB to distribute the shares based on the findings of the arbitrator or arbitrators. Paragraph 5 of the Escrow Agreement had elaborate provisions for the selection of one arbitrator, if Acceptance and the authorized representative agreed, and for the selection of two arbitrators, one by Acceptance and one by the authorized representative, which two arbitrators were to appoint a third, if Acceptance and the authorized representative could not agree.

While the Escrow Agreement thus provided for an authorized representative until the escrowed shares were distributed, at best the agreement gave that representative authority until June 30, 1996, to settle any dispute with Acceptance. Nelson had authority to agree to amend the Escrow Agreement, but he

did not do so. We find no mention of arbitration by either party, but we cannot see how the failure to arbitrate would prolong the authority of Nelson or the shareholder committee to negotiate a settlement with Acceptance.

We realize that aside from the provisions of the Escrow Agreement, the shareholders could have separately agreed to select a committee to represent them in negotiations and to bind them with a settlement they might have negotiated. The minutes from the July 22, 1996, meeting show that only eight of the shareholders, who together owned 31,957.36 escrowed shares, were present at the meeting when they agreed to "select a committee to conduct the evaluation process" and selected the members thereof. The minutes further stated, "It was decided that this committee would have the authority to act on behalf of all of the shareholders in this matter and that [it] will report the results of [its] efforts in a reasonable and timely ma[nn]er to all shareholders." This is at most the assumption of such authority by those present. These minutes state that all shareholders were welcome to attend committee meetings. The minutes of the meeting of July 24 show that "[i]t was unanimously agreed by the committee that each member of the committee would have one vote and [that] a simple majority would prevail." Another committee meeting was set for approximately 2 weeks later. The record shows that copies of these minutes were mailed to the holders of all the escrowed shares.

■ An undated notice was sent to all the shareholders, telling them that the "Escrow Committee" had been negotiating and that it would like to hold a shareholders' meeting at a stated time and place. The notice asked shareholders who would be unable to attend to sign a power of attorney that gave the escrow committee broad power to represent them, including the power to settle. These documents were returned by twelve of the shareholders. The documents clearly gave the committee authority to settle on behalf of those who signed them, but we can see no basis for concluding that all holders of the escrowed shares gave such authority. There is no showing that Swartzbaugh signed such an authorization. We think the applicable rule is: "Authority to compromise or settle must rest upon a special power creating it, which the principal has given or is estopped to

deny, or upon a general managing agency broad enough to embrace it." 2A C.J.S. *Agency* § 233 at 934 (1972).

The correct characterization of the situation of the parties in this case at the time of the closing is that a controversy existed between Acceptance on one side and numerous former Redland shareholders on the other. A dispute arising with one party on one side and multiple parties on the other is not a unique situation. Absent a binding agreement, in such a situation, each of the several parties with similar or identical interests can participate in settlement negotiations, or part of such negotiations, as the party chooses, without being bound by any settlement the majority might make. We can find nothing in the proceedings of the shareholders or the shareholder committee they selected which bound any of the shareholders to accept a settlement, except the powers of attorney signed by some of the shareholders, which gave the shareholder committee power to settle on their behalf. We believe the applicable rule to be: "Several principals may be bound by the acts and representations of a common agent, but it must appear that authority was given by all the alleged principals, and an agent cannot bind one principal in the separate business of another." *Id.*, § 245 at 953. There is no evidence that Swartzbaugh agreed to be bound by a settlement made by the shareholder committee.

Acceptance argues that the shareholder committee had the apparent authority to settle. Acceptance recognizes, citing *Landmark Enterprises v. M.I. Harrisburg Assocs.*, 250 Neb. 882, 554 N.W.2d 119 (1996), that for the committee to have acquired this apparent authority as to Swartzbaugh, the communication leading Acceptance to believe that the committee had such authority must have come from Swartzbaugh. Acceptance argues that by participating in the negotiations, Swartzbaugh gave the committee the apparent authority to settle the dispute. However, the record established without dispute that before the settlement between the shareholder committee and Acceptance, Acceptance was clearly advised that Swartzbaugh would not agree to the settlement.

Swartzbaugh cites *Scottsbluff Nat. Bank v. Blue J Feeds, Inc.*, 156 Neb. 65, 83; 54 N.W.2d 392, 403 (1952), for the proposition that a principal is not estopped to deny the agent's authority to perform a particular act, on the ground that it was within

the agent's apparent authority, " 'unless the authority to perform it was apparent to the person dealing with the agent, and by him relied on.' " He argues that the evidence shows that Acceptance did not rely upon his action with the shareholder committee. We find no further express statement in a Nebraska case that recognizes the rule that a person relying upon apparent authority must prove reliance. That notion seems inherent in such statements as "Apparent or ostensible authority 'may be conferred if the alleged principal affirmatively, intentionally, or by lack of ordinary care causes third persons to act upon the apparent authority,' " *Double K, Inc. v. Scottsdale Ins. Co.*, 245 Neb. 712, 719, 515 N.W.2d 416, 421 (1994). It would be difficult to see how someone can act upon appearances without relying upon them, and 2A C.J.S., *supra*, § 162 states that reliance upon the apparent authority is necessary. Restatement (Second) of Agency § 27 at 103 (1958) states in part:

> [A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

It is difficult to see how a person can claim apparent authority when he or she does not believe that the authority was granted and nevertheless relies upon that authority.

The record in this case rather clearly shows that Acceptance was not relying upon the shareholder committee's having authority to settle. The evidence shows that one of the conditions Acceptance required as part of the settlement, both for an earlier settlement its board had rejected and for the one that was ultimately signed, was that each shareholder with shares in escrow sign a release. The documents used to accomplish the final settlement embodied an agreement between Acceptance and the shareholder committee, but a release was executed by every shareholder except Swartzbaugh. Furthermore, on February 28, 1997, a lawyer representing the shareholder committee wrote a letter to the lawyer representing Acceptance in answer to a question concerning the shareholder committee's authority. That letter reviewed the history of the appointment of

the shareholder committee and some of the committee's initial actions. It is clear that Acceptance was relying upon its knowledge of the shareholder committee's actual authority, not upon any apparent authority.

(e) Effect of 1997 Settlement of Other Actions

Swartzbaugh had started a lawsuit in federal court against Nelson and others regarding matters related to Redland, and on March 27, 1997, that lawsuit was settled by a release agreement between a group of entities associated with Swartzbaugh and a group of entities associated with Nelson. The release provided that Swartzbaugh was a member of the Swartzbaugh group and that Acceptance was a member of the Nelson group. Under the release, the Nelson group released all claims its members had against the members of the Swartzbaugh group and the Swartzbaugh group released all claims its members had against the members of the Nelson group. The release encompassed all claims either known or unknown, except as provided in the release's section 5. Section 5 provided that the release did not

> pertain to, and d[id] not discharge[,] any person or entity from any liability, action, cause of action, or claim of any kind and nature sounding in negligence or any non-intentional tort theory, in any way arising out of, resulting from, or pertaining to claims that Swartzbaugh may have to the shares of common stock of Acceptance . . . which were escrowed pursuant to Section 2.2 of [article II of] the [Exchange] Agreement, as amended, and which ha[ve] commonly been referred to by [both groups] as . . . the "basket" and/or "bucket" issue, with any such liability, claims, or causes of action being limited to the fair market value of the escrowed shares of stock held in Swartzbaugh's name, which [are] 20,396.82 shares. Likewise, THE NELSON GROUP reserve[d] its rights to assert any claims or counterclaims sounding in negligence or any non-intentional tort theory, and any affirmative defenses it may have against THE SWARTZBAUGH GROUP.

Acceptance argues that the release "did not preserve [Swartzbaugh's right to assert] contractual claims or defenses of the nature raised by [him] in this proceeding with respect to

the escrowed shares." Brief for appellant at 29. Swartzbaugh argues that the release excluded claims " 'sounding in negligence or any non-intentional tort theory, in any way arising out of, resulting from, or pertaining to claims that Swartzbaugh may have to the shares of common stock of Acceptance . . . which were escrowed,' " making the release ineffective as to his claim to the Acceptance shares in escrow. Brief for appellee Swartzbaugh at 31.

Clearly, Swartzbaugh's claim to the shares in escrow is not an intentional tort claim. See, *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998) (intentional torts generally require that actor intend consequences of act, not simply act itself); *Voyles v. Sandia Mortg. Corp.*, 311 Ill. App. 3d 649, 724 N.E.2d 1276, 244 Ill. Dec. 192 (2000) (intentional tort evinces desire to cause consequences or evinces at least substantially certain belief that consequences will result). Therefore, we agree that the release does not apply to or extinguish Swartzbaugh's claim to the shares held in escrow, whether his claim is deemed a tort claim or a contract claim.

We therefore conclude that the trial court was correct in determining that Swartzbaugh was entitled to the 20,396.82 shares of his Acceptance stock which FNB is holding in escrow.

### 2. SWARTZBAUGH'S CLAIM FOR CONVERSION

Conversion is an action at law. See *Alter v. Bank of Stockham*, 51 Neb. 797, 71 N.W. 715 (1897). In the instant case, the factual issues concerning conversion were tried to the court. In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *In re Estate of Craven*, 265 Neb. 41, 654 N.W.2d 196 (2002). However, on a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *In re Interest of Anthony R. et al.*, 264 Neb. 699, 651 N.W.2d 231 (2002).

Acceptance argues that Swartzbaugh did not and could not prove the elements of conversion. It argues that by the Escrow Agreement, Swartzbaugh agreed that FNB could hold the stock until any disagreement over the shares was resolved; that the Escrow Agreement provides that Acceptance could assert a claim

over the stock; that under the Escrow Agreement, Swartzbaugh was not entitled to immediate possession of the stock; and that Acceptance did not exercise dominion over the stock. Swartzbaugh asserts that the conversion was accomplished on July 5, 1996, by the backdated claim, which was the only basis upon which FNB withheld distribution of the stock to him when he had the right to possession.

The evidence shows that prior to June 30, 1996, Acceptance had communicated to Nelson, then the authorized representative of the Redland shareholders, that it would make a claim against the escrowed shares; Nelson did not, however, acknowledge having received a formal written notice by that date as required by the Escrow Agreement. The evidence shows that on July 5, Acceptance gave written notice of a claim through its general counsel. That written notice states in substance that Acceptance had asserted a claim against the shares held in escrow as authorized under article X of the Exchange Agreement. In that notice, Acceptance does not assert ownership of the escrowed shares or any part thereof. The Escrow Agreement provided that while the shares were held in escrow, the Redland shareholders were entitled to vote the shares and to receive the dividends payable from them. Acceptance did not demand or request that FNB distribute the shares to it, nor did it seek to interfere with the shareholders' voting or dividend rights; it merely asserted that it had made a claim of an unspecified amount against those shares. Later claims make clear that Acceptance maintains that the value of its claim exceeds the value of the escrowed shares, but the July 5 notice did not. The evidence shows that prior to June 30, the bank officer in charge of the escrow was aware of an impending claim, and that after the July 5 claim, FNB received numerous communications from attorneys in regard to Acceptance's claims and the Redland shareholders' position, including demands that FNB deliver the shares out of escrow. FNB, as the escrow agent, found itself in a position where there were conflicting claims and, upon the advice of counsel, did not distribute the shares. The Escrow Agreement provided that in the event of a dispute, the escrow agent could simply keep the shares, and that its only duty was "safekeeping" of the shares.

While the gist of Acceptance's July 5, 1996, written notice was that due to its losses, it was entitled to have all of the shares distributed out of escrow to it, it never claimed to own the shares. The interest it claimed was in the nature of security for damages it suffered under the Exchange Agreement. After exhaustive research, we have found no cases where the assertion of a security claim against the property of another in the possession of a third party for safekeeping has been considered a conversion of that property.

Swartzbaugh relies upon verbatim quotes from cases where the facts are quite different from those at hand. He cites the rule that "[t]ortious conversion is any distinct act of dominion wrongfully asserted over another's property in denial of or inconsistent with that person's rights," *Baye v. Airlite Plastics Co.*, 260 Neb. 385, 393, 618 N.W.2d 145, 152 (2000), and he cites *Zimmerman v. FirsTier Bank*, 255 Neb. 410, 418, 585 N.W.2d 445, 451-52 (1998), for the proposition that "[t]he plaintiff must establish a right to immediate possession of the property at the time of the alleged conversion. . . . In other words, 'the essence of conversion is not acquisition by the wrongdoer, but the act of depriving the owner wrongfully of the property'" (citations omitted). He also cites the old case *Indiana Harbor Belt R. Co. v. Alprin*, 139 Neb. 14, 296 N.W. 158 (1941). The claims for conversion in all of these cases involved situations where the alleged converter was the party in possession of the contested property, and consequently, these cases do not throw much light on the issues of the instant case.

The rule cited from *Baye* has meaning only if the meaning of "dominion" is established. In *Zimmerman*, an act of transfer was held to be an act of dominion inconsistent with the true owner's rights sufficient to support a claim of conversion. In the instant case, Acceptance did not attempt to transfer the stock. Dominion means "1. Control; possession, <dominion over the car>. 2. Sovereignty <dominion over the nation>." Black's Law Dictionary 502 (7th ed. 1999). The definitions of dominion in Webster's Encyclopedic Unabridged Dictionary of the English Language 425 (1989) that might be applicable to the situation in this case are "1. the power or right of governing and controlling; sovereign authority. 2. rule; control; domination." When FNB had

possession of the stock and that possession was not disputed by Acceptance, we have difficulty understanding how Acceptance can be said to have had dominion over that stock.

In *Polley v. Shoemaker*, 201 Neb. 91, 266 N.W.2d 222 (1978), the defendants locked the plaintiffs out of a building which the plaintiffs had leased but which was unusable due to fire damage during a time when the plaintiffs technically had the right to possession of the building. The defendants notified the plaintiffs that they could remove their personal property at certain times. The decision and rationale of the *Polley* court are instructive in the case at hand. The *Polley* court stated:

> The "tort of conversion has been confined to those major interferences with the chattel, or with the plaintiff's rights in it, which are so serious, and so important, as to justify the forced judicial sale to the defendant which is the distinguishing feature of the action." [William L.] Prosser, [Handbook of the] Law of Torts [§ 15 at 80-81 (4th ed. 1971)]. In Restatement [(Second) of] Torts [§ 222 A at] 431 [(1965)], it is stated: "(1) Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." Therefore it can be seen that not all exercise of dominion over or interferences with the use of chattels constitute conversion.

201 Neb. at 95, 266 N.W.2d at 225.

The *Polley* court held that the trial court was correct in determining that there had been no conversion, notwithstanding the fact that the defendant had denied the plaintiffs some access and, hence, exercised some control over the property, withholding from the plaintiffs some rights of ownership which they were technically entitled to have at any time. The *Polley* court held that a defendant's interference with a plaintiff's property that is an exercise of dominion or control but which does not seriously interfere with a plaintiff's right of control is not actionable as conversion.

Swartzbaugh does not seek the damages usually allowable for conversion, that is, the forced sale of the converted property to the converter as of the date of the alleged conversion; rather, he seeks

the inconsistent remedy of return of the property plus damages for the decrease in its value while the prolonged litigation ensued. (The evidence shows that the stock was listed on NASDAQ at $18.125 per share on July 5, 1996, then increased in value until September 23, 1997, but was worth only $4.6875 on July 11, 2000.) Swartzbaugh does not allege, and the evidence does not show, that he wanted to sell the stock. We do not believe that the general statements cited by Swartzbaugh support a claim for conversion, at least not one where possession of the converted property and damages are sought. We therefore conclude that the trial court erred in awarding damages for conversion but was correct in refusing to award damages for loss of use.

### 3. AWARD OF ATTORNEY FEES

In his second amended cross-petition, Swartzbaugh alleged that he had been required to expend costs and attorney fees in the interpleader action and prayed for a judgment for the attorney fees fairly and reasonably expended in defense of his title to the escrowed shares. On the attorney fee issue, the court found that Acceptance's reliance on the late notice of a claim was without merit and that to allow Acceptance to take the position that it did would encourage others to force a lawful owner to compromise or negotiate its position. Therefore, "in equity and pursuant to [§] 25-824," it allowed Swartzbaugh $149,364 in costs and attorney fees.

In his operative pleading, Swartzbaugh did not allege grounds for an award of attorney fees under § 25-824. Swartzbaugh's counsel admits that "'[t]he general rule in Nebraska is that an attorney fee may be recovered only when authorized by statute, or when a recognized and accepted uniform course of procedure allows recovery of an attorney fee.'" Brief for appellee Swartzbaugh at 40, quoting *Rosse v. Rosse*, 244 Neb. 967, 510 N.W.2d 73 (1994). Swartzbaugh's counsel justifies the allowance upon the basis of § 25-824 and upon the rule recognized in *Tetherow v. Wolfe*, 223 Neb. 631, 392 N.W.2d 374 (1986) (in negligence action, plaintiffs were allowed to recover attorney fees incurred in separate lawsuit in which they unsuccessfully sought to enforce contract negligently drawn by defendant). Very few if any of the fees in this

case involved the action against FNB, and the holding in *Tetherow* does not apply.

In his operative pleading in support of an award of attorney fees, Swartzbaugh pled neither of the above-stated grounds cited by the trial court. Subdivision (2) of § 25-824 provides that such an award can be made if the court determines that a claim or defense is frivolous or made in bad faith. The meaning of "frivolous" has been clearly defined by the Nebraska Supreme Court:

> For purposes of § 25-824, "frivolous" means an attempt to relitigate the same issues resolved in prior proceedings with the same parties, see *Cedars Corp. v. Sun Valley Dev. Co.*, 253 Neb. 999, 573 N.W.2d 467 (1998), or a legal position wholly without merit, that is, without rational argument based on law and evidence to support a litigant's position, see *Foiles v. Midwest Street Rod Assn. of Omaha*[, 254 Neb. 552, 578 N.W.2d 418 (1998)]. Any doubt as to whether a legal position is frivolous should be resolved in favor of the party whose legal position is in question. *Id.*

*Schuelke v. Wilson*, 255 Neb. 726, 737, 587 N.W.2d 369, 377 (1998).

Usually, one side of every litigated issue is without merit. However, under the quoted definition, it is rare that litigated issues without merit are also frivolous. In this case, the evidence shows that well-represented people with great economic interest saw fit to settle the claim that Swartzbaugh now argues was frivolous. In addition, the members of this court spent considerable time and did considerable research to determine the validity of Acceptance's claim. Acceptance's claim was without merit, but it was not frivolous. The trial court erred in allowing Swartzbaugh any attorney fees.

## V. CONCLUSION

We therefore conclude that the trial court did not err in granting Swartzbaugh's motion for partial summary judgment, denying Acceptance's motion for summary judgment, and denying Swartzbaugh damages for loss of use. However, we conclude that it erred in finding that Acceptance converted Swartzbaugh's shares, in awarding him damages therefor, and in awarding him

attorney fees and costs. Accordingly, we affirm the trial court's order directing FNB to distribute the 20,396.82 shares to Swartzbaugh and denying him damages for loss of use, but reverse the remainder of the trial court's order and remand the cause with directions to vacate the money judgment awarded to Swartzbaugh and dismiss his cross-petition for conversion. Taxable costs of this appeal and in the district court are ordered divided equally between Acceptance and Swartzbaugh.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.